UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GRAND JURY B-09-01

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No.: |
| | Violations: |
| v. | |
| | 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud and Bank Fraud) |
| DOMINGOS DIAS and HECTOR NATERA, | 18 U.S.C. § 1343 (Wire Fraud) |
| Defendants. | 18 U.S.C. § 1344 (Bank Fraud) |
| | 18 U.S.C. § 2 (Aiding and Abetting) |

## INDICTMENT

The Grand Jury charges:

### COUNT ONE
### (18 U.S.C. § 1349 - Conspiracy to Commit Wire Fraud and Bank Fraud)

### The Defendants and Other Persons and Entities

1.   At all times relevant to this Indictment, HECTOR NATERA ("NATERA") and DOMINGOS DIAS ("DIAS"), the defendants, were the *de facto* leaders and organizers of a conspiracy to fraudulently obtain millions of dollars of real estate loans from banks and mortgage lenders.

2.   NATERA and DIAS recruited straw buyers (that is, buyers in name only), found sellers, and orchestrated and directed the creation and flow of fictitious documentation and information that was needed to obtain fraudulent real estate loans. NATERA and DIAS also directed and oversaw the distribution of fraud proceeds after a loan for a property had been fraudulently obtained and the closing had taken place. The objective of the conspiracy was to induce straw buyers to obtain mortgage loans in the straw buyers' names by providing materially false information to the real estate lenders, banks or mortgage companies. NATERA and DIAS

would then use some or all of the proceeds of the real estate loans to enrich NATERA, DIAS and others.

3. At all times relevant to this Indictment:

a. NATERA worked from offices located at 1944 Boston Avenue, Bridgeport, Connecticut ("1944 Boston Avenue") and held himself out as a real estate agent and a mortgage broker.

b. NATERA controlled the activities of two limited liability companies organized under the laws of the State of Connecticut and referred to herein as "LLC-1" and "LLC-2". NATERA used LLC-1 and LLC-2 to further the objectives of the conspiracy, to facilitate the purchase and sale of real property in Connecticut, and to facilitate the fraudulent diversion of real estate loan proceeds.

c. NATERA held a real estate agent's license issued by the State of Connecticut, and was a member of various local multiple listing services ("MLS").

d. DIAS worked out of the offices at 1944 Boston Avenue and elsewhere and held himself out as a real estate agent or a mortgage broker.

e. DIAS did business under a name referred to herein as "DBA-1". DIAS also did business using the name of a limited liability company organized under the laws of the State of Connecticut and referred to herein as "LLC-3". DIAS used DBA-1 and LLC-3 to further the objectives of the conspiracy and to facilitate the fraudulent diversion of real estate loan proceeds.

f. A real estate appraiser, referred to herein as "the Appraiser", was doing business under the name of a limited liability company organized under the laws of the State of Connecticut and referred to herein as "LLC-4". The Appraiser prepared

2

materially false appraisals of the real property which were provided to mortgage lenders to support inflated real property values. The Appraiser had access to the MLS for New Haven County, Connecticut.

g. An individual referred to herein as "Jane Doe" worked out of offices located at 1944 Boston Avenue and held herself out as a real estate professional. Jane Doe acted as a trustee for a land trust, referred to herein as "the Land Trust", in a transaction described below.

h. Three lawyers involved in transactions, described below and referred to herein individually as Lawyer B, Lawyer F and Lawyer P, were attorneys licensed to practice law in the State of Connecticut.

i. Three straw buyers, referred to herein as Straw Buyers 1, 2 and 3, were individuals identified and used by NATERA and DIAS to apply for mortgage loans using materially false and fraudulent information and to purchase real estate identified by NATERA and DIAS.

j. An individual referred to herein as "Homeowner SM" was the owner of 455 Wayne Street, Bridgeport, Connecticut.

k. MortgageIT was a mortgage lender with offices in New York and a subsidiary of Deutsche Bank.

l. AMTrust Bank ("AmTrust"), formerly known as Ohio Savings Bank, was a financial institution insured by the Federal Deposit Insurance Corporation.

m. Countrywide Home Loans, Inc. ("Countrywide") was a mortgage lender with offices in California.

3

n.  The Mortgage Store Financial, Inc. ("TMSF") was an entity engaged in the business of making residential mortgage loans.

o.  A non-profit charitable organization, referred to hereinafter as "the Non-Profit Group", operated within Connecticut.

## The Conspiracy

4.  From in or about January 2006 and continuing to in or about April 2008, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, HECTOR NATERA and DOMINGOS DIAS, the defendants, unlawfully, knowingly and willfully did conspire, combine, confederate and agree with each other, and others known and unknown to the Grand Jury:

a.  to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing and attempting to execute the scheme and artifice did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343; and

b.  to devise and intend to devise, and execute and attempt to execute, a scheme and artifice to defraud financial institutions, and to obtain moneys, property, credits, assets, securities or other property owned by or under the custody or control of financial institutions, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

### Purpose of the Conspiracy

5.   The purpose of the conspiracy was to enrich NATERA, DIAS and others by obtaining millions of dollars of residential real estate loans through the use of sham sales contracts, false loan applications and fraudulent property appraisals, and to conceal the conspiracy from others.

### The Manner and Means of the Conspiracy

The manner and means by which the defendants and others known and unknown to the Grand Jury sought to accomplish the objects of the conspiracy included the following:

6.   It was part of the conspiracy that NATERA and DIAS would and did arrange for and cause materially false Uniform Residential Loan Applications to be prepared and submitted to mortgage brokers and financial institutions in the names of Straw Buyers 1, 2 and 3. The false information on the loan applications included false employment and rental payment information, false accounts of other real estate owned by the straw buyers, and sham bank deposit information regarding the straw buyers' bank account balances and the source of down payments for the properties to be purchased.

7.   It was further part of the conspiracy that NATERA and DIAS would and did arrange for Lawyer B, Lawyer F or Lawyer P to act as the escrow agent or closing agent for closings.

8.   It was further part of the conspiracy that lawyers acting under the direction of NATERA and DIAS, including Lawyer B, Lawyer F, and Lawyer P, would and did prepare and submit materially false HUD-1 forms and other false information to the mortgage lenders based on false information provided to them by NATERA, DIAS and others in order to conceal, among other things, the true disposition of the loan proceeds.

9. It was further part of the conspiracy that NATERA and DIAS would and did conceal the true purchase price from Straw Buyers 1, 2 and 3 so that NATERA and DIAS could more easily "skim" the amount generated by a new mortgage in excess of the actual sales price.

10. It was further part of the conspiracy that NATERA and DIAS would and did use the Appraiser to prepare real estate appraisals and provide the Appraiser with the required appraisal value to ensure that the straw buyer would qualify for the desired mortgage amount.

11. It was further part of the conspiracy that NATERA and DIAS would and did cause sham real property listings be posted on the local MLS at a price that approximated the straw buyer's purchase price for the real property. At the time of the posting of the sham real property listings, there were legitimate listings for the same properties posted on the MLS at significantly lower prices.

12. It was further part of the conspiracy that NATERA and DIAS would and did arrange for the Appraiser to prepare materially false real property appraisals using Freddie Mac Form 72 and Fannie Mae Form 1025, which were submitted to the lenders to support artificially high purchase prices.

13. It was further part of the conspiracy that NATERA and DIAS would and did provide Straw Buyer 1 and Straw Buyer 2 with cash deposits in accounts or cash equivalent funds in the form of cashier's checks to make it appear that Straw Buyer 1 and Straw Buyer 2 had significant funds in bank accounts when, in truth, they did not.

14. It was further part of the conspiracy that NATERA and DIAS would and did provide Lawyer B and Lawyer P with sham cashier's checks to use at real estate closings to give the appearance that the checks were funds owned by the straw buyers when, in truth, they were not.

### Overt Acts

15. In furtherance of the conspiracy, and to accomplish its purposes and objects, the defendants and their co-conspirators committed and caused others to commit the following overt acts, among others, in the District of Connecticut and elsewhere:

### 272-274 Carroll Avenue and 276-278 Carroll Avenue

a. On or about June 9, 2006, DIAS, using DBA-1, entered into contracts to purchase 272-274 Carroll Avenue, Bridgeport, Connecticut ("272 Carroll Avenue") and 276-278 Carroll Avenue, Bridgeport, Connecticut ("276 Carroll Avenue"; together with 272 Carroll Avenue, the "Carroll Avenue Properties"), which are adjacent multi-family residential properties, for $132,500 each, or a total of $265,000.

b. On or about June 29, 2006, the Appraiser prepared residential real estate appraisals for each of the Carroll Avenue Properties and falsely answered a question on each of the appraisal forms regarding whether the properties had been offered for sale within the 12 months prior to June 15, 2006, by stating that he had consulted "MLS Pub. Rec.", and falsely stated that there had been no such listings.

c. On or about July 7, 2006, DIAS caused materially false information to be submitted in support of applications by Straw Buyer 1 to TMSF and Countrywide for loans to finance Straw Buyer 1's purchase of the Carroll Avenue Properties. The documents on which the false information appeared included the following: (1) a materially false Uniform Residential Mortgage Application in the name of Straw Buyer 1; and (2) a materially false verification of rent by LLC-3.

7

d.  On or about July 11, 2006, DIAS caused $98,650 of the closing proceeds for each of the Carroll Avenue Properties to be delivered to DBA-1, or a designee of DBA-1, for "services rendered", when in truth and in fact, no services had been rendered.

e.  On or about July 11, 2006, DIAS and others acting at the direction of DIAS directed Lawyer P to prepare and submit to TMSF a Form HUD-1 for the sale of 272 Carroll Avenue which falsely represented that $98,650 of the loan proceeds was being paid to DBA-1 for "services rendered".

f.  On or about July 11, 2006, DIAS and others acting at the direction of DIAS directed Lawyer P to prepare and submit to Countrywide a Form HUD-1 for the sale of 276 Carroll Avenue which falsely represented that $98,650 of the loan proceeds was being paid to DBA-1 for "services rendered".

### 207 Boston Avenue

g.  In 2007, DIAS showed Straw Buyer 2 a two-family house at 207 Boston Avenue, Stratford, Connecticut ("207 Boston Avenue"), and told him it would be a good investment for him to buy. The property had a tenant on the first floor, and DIAS told Straw Buyer 2 he could probably purchase it for $190,000 to $220,000.

h.  On or about April 15, 2007, NATERA created, or caused to be created, a sham real estate listing on the local MLS, indicating that 207 Boston Avenue was being offered for sale by the owner for $369,000.

i.  On or about May 9, 2007, the Appraiser prepared and delivered to Countrywide an appraisal of 207 Boston Avenue, determining a value of $359,000 as of April 16, 2007. The appraisal contained materially false information regarding whether 207 Boston Avenue was currently offered for sale or had been offered for sale within the 12 months prior to the effective

8

date of the appraisal, and contained materially false information regarding MLS listings for the property.

      j.    On or about May 10, 2007, NATERA, acting on behalf of LLC-2, entered into a contract to purchase 207 Boston Avenue for $253,000.

      k.    On or about May 14, 2007, DIAS prepared, or caused to be prepared, documents containing materially false information in support of loan application by Straw Buyer 2 to purchase 207 Boston Avenue for $360,000. The documents included a materially false Uniform Residential Mortgage Application in the name of Straw Buyer 2.

      l.    On or about May 15, 2007, NATERA and others arranged for a People's Bank cashier's check, number 605963, in the amount of $36,064.51, to be drawn and delivered to Lawyer B for the purpose of falsely demonstrating to Countrywide that Straw Buyer 2 had funds available to be used as a down payment on the purchase of 207 Boston Avenue.

      m.    ~~On or about May 15, 2007, Lawyer B submitted or caused to be submitted to~~ Countrywide a Form HUD-1 which falsely represented that: (1) the seller was selling 207 Boston Avenue for a sale price of $360,000; (2) the seller of 207 Boston Avenue would be paid $275,783.60 in cash, after payment of the seller's mortgages, closing costs and a "closing cost credit" of $18,000; and (3) Straw Buyer 2 had paid a down payment toward the purchase price of the property.

      n.    NATERA, acting as a manager of LLC-2, signed a receipt for $88,187.50 of the closing proceeds from Countrywide originally delivered to the seller.

### 455 Wayne Street

o.  On or about November 8, 2006, NATERA met with Homeowner SM at 1944 Boston Avenue, and directed Homeowner SM to execute a number of documents, including a warranty deed transferring the title to 455 Wayne Street, Bridgeport, Connecticut ("455 Wayne Street") to LLC-1, a rental agreement pursuant to which Homeowner SM would pay "rent" to LLC-1 in an amount equal to the mortgage payment, and an option agreement providing that Homeowner SM could repurchase the house at 455 Wayne Street from LLC-1 after one year, if the rental payments had been timely made.

p.  On or about February 20, 2007, NATERA caused a warranty deed to be recorded on the City of Bridgeport Land Records, transferring the title to 455 Wayne Street from Homeowner SM to LLC-2. The warranty deed recited that Homeowner SM had been paid $190,000 as consideration for the transfer of the title for 455 Wayne Street.

q.  On or about February 20, 2007, after the warranty deed had been recorded, NATERA recorded or caused to be recorded a second priority mortgage against 455 Wayne Street granted by one of NATERA's LLCs to a private lender.

r.  On or about May 8, 2007, NATERA recorded or caused to be recorded a deed transferring the title to 455 Wayne Street from LLC-2 to the 455 Wayne Street Land Trust, a land trust created by or at the direction of NATERA for the purpose of holding title to the house.

s.  In or about June 2007, DIAS caused documents containing false information to be prepared so that Straw Buyer 2 could apply to MortgageIt for a $225,250 loan to use to purchase 455 Wayne Street, including a materially false Uniform Residential Mortgage Application in the name of Straw Buyer 2.

t.      On or about June 6, 2007, NATERA and DIAS caused Straw Buyer 2 to close the residential mortgage loan from MortgageIt in the amount of $225,250, and to purchase 455 Wayne Street from the 455 Wayne Street Land Trust for $265,000.

### 682 Prospect Street

u.      On or about February 6, 2007, LLC-1 entered into a contract to purchase 682 Prospect Street, New Haven, Connecticut ("682 Prospect Street"), which was owned by the Non-Profit Group, for $500,000.

v.      On or about April 24, 2007, NATERA created, or caused to be created, a real estate listing on the MLS indicating that 682 Prospect Street was being offered for sale for $949,000.

w.      On or about July 5, 2007, the Appraiser prepared an appraisal of 682 Prospect Street with an effective date of March 23, 2007, valuing the property at $900,000. The appraisal was submitted to AMTrust Bank in support of Straw Buyer 3's $900,000 loan application for the purchase of 682 Prospect Street. The appraisal included materially false information regarding both the condition of the property and MLS information for the property.

x.      On or about August 9, 2007, NATERA caused the title of 682 Prospect Street to be transferred from the Non-Profit Group to the Land Trust at a purchase price of $500,000. Jane Doe was the trustee of the Land Trust. Neither Jane Doe nor the Land Trust paid anything for 682 Prospect Street.

y.      On or about August 9, 2007, NATERA caused Jane Doe to transfer title to 682 Prospect Street to Straw Buyer 3 at a stated purchase price of $900,000.

z.      On or about August 9, 2007, NATERA caused a Form HUD-1 to be delivered to AmTrust which stated that 682 Prospect Street had been purchased for $900,000 from the Land

Trust but which failed to disclose the simultaneous transfer of the property from the Non-Profit Group to the Land Trust for $500,000.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH EIGHT
### ( 18 U.S.C. § 1343 and § 2 - Wire Fraud)

16.     The allegations contained in Paragraphs 1 through 14 of Count One of this Indictment are realleged as though fully set forth herein.

17.     From in or about January 2006 and continuing to in or about July 2007, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, HECTOR NATERA and DOMINGOS DIAS, the defendants, knowingly, willfully and with intent to defraud did devise and intend to devise a scheme and artifice to obtain money and property by defrauding mortgage lenders and financial institutions out of money and property by means of materially false and fraudulent pretenses, representations and promises, which scheme and artifice is set forth in paragraphs 6 through 15 of Count One of this Indictment.

18.     For the purpose of executing and attempting to execute the aforesaid scheme and artifice to defraud, on or about the dates listed below, in the District of Connecticut and elsewhere, the defendants did knowingly cause to be transmitted by means of wire communication in interstate commerce the following, each of which constitutes a separate count of the Indictment against the individual defendant identified:

| Count | Date | Defendant | Use of Interstate Wire | States Involved in Wire |
|---|---|---|---|---|
| Two | 6/30/2006 | DIAS | Wire of $251,471.19 from a Countrywide Home Loans account at Bank of New York to the IOLTA account of Lawyer P at People's Bank, in connection with a closing for 276-278 Carroll Avenue, Bridgeport, CT | NY to CT |
| Three | 7/07/2006 | DIAS | Wire of $243,269.75 from The Mortgage Store's account at Washington Mutual Bank to the IOLTA account of Lawyer P at People's Bank, in connection with a closing for 272-274 Carroll Avenue, Bridgeport, CT | WA to CT |
| Four | 5/15/2007 | DIAS NATERA | Wire of $11,380 from Lawyer B's account at Bank of America to an account at People's Bank in connection with a closing for 455 Wayne Street, Bridgeport, CT | NY to CT |
| Five | 6/1/2007 | DIAS NATERA | Wire of $174,443.23 from Lawyer B's account at Bank of America to a law firm's bank account at People's Bank in connection with a closing for 455 Wayne Street, Bridgeport, CT | NY to CT |
| Six | 6/6/2007 | DIAS NATERA | Wire of $13,273.75 from Lawyer B's account at Bank of America to an account at People's Bank in connection with a closing for 455 Wayne Street, Bridgeport, CT | NY to CT |
| Seven | 6/6/2007 | DIAS NATERA | Wire of $600 from Lawyer B's account at Bank of America to the Appraiser's account at Webster Bank, N.A. in connection with a closing for 455 Wayne Street, Bridgeport, CT | NY to CT |

| Count | Date | Defendant | Use of Interstate Wire | States Involved in Wire |
|---|---|---|---|---|
| Eight | 6/12/2007 | DIAS NATERA | Wire of $72,314.42 from Lawyer B's account at Bank of America to an account at People's Bank in connection with a closing for 455 Wayne Street, Bridgeport, CT | NY to CT |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT NINE
### ( 18 U.S.C. § 1344 and § 2 - Bank Fraud)

19.  The allegations set forth in paragraphs 1 through 14 of Count One of this Indictment are realleged as though fully set forth herein.

20.  From in or about February 2007 and continuing to in or about August 2007, the precise dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, HECTOR NATERA and DOMINGOS DIAS, the defendants, knowingly, willfully and with intent to defraud did devise a scheme and artifice to defraud AMTrust Bank, and to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of AMTrust Bank, by means of false or fraudulent pretenses, representations, or promises, and did execute and attempt to execute the scheme and artifice by causing AMTrust Bank to make a loan to Straw Buyer 3 secured by a mortgage on the real property identified below.

| Count | Date of Loan | Bank | Property | Amount of Loan |
|---|---|---|---|---|
| Nine | 8/9/2007 | AmTrust Bank | 682 Prospect Street New Haven, CT | $540,000 |

All in violation of Title 18, United States Code, Sections 1344 and 2.

A TRUE BILL

/s/
_____
FOREPERSON

_____
DEIRDRE M. DALY
ACTING UNITED STATES ATTORNEY

_____
ANN M. NEVINS
ASSISTANT UNITED STATES ATTORNEY